# MAINE *v.* GRAND TRUNK RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MAINE.

No. 29. Submitted April 14, 1891. — Decided December 14, 1891.

A state statute which requires every corporation, person or association operating a railroad within the State to pay an annual tax for the privilege of exercising its franchises therein, to be determined by the amount of its gross transportation receipts, and further provides that, when applied to a railroad lying partly within and partly without the State, or to one operated as a part of a line or system extending beyond the State, the tax shall be equal to the proportion of the gross receipts in the State, to be ascertained in the manner provided by the statute, does not conflict with the Constitution of the United States; and the tax thereby imposed upon a foreign corporation, operating a line of railway, partly within and partly without the State, is one within the power of the State to levy.

The court stated the case as follows:

The defendant is a corporation created under the laws of Canada, and has its principal place of business at Montreal, in that Province. Its railroad in Maine was constructed by the Atlantic and St. Lawrence Railroad Company, under a charter from that State, which authorized it to construct and operate a railroad from the city of Portland to the boundary line of the State; and, with the permission of New Hampshire and Vermont, it constructed a railroad from that city to Island Pond in Vermont, a distance of 149½ miles, of which 82½ miles are within the State of Maine. In March, 1853, that company leased its rights and privileges to the defendant, The Grand Trunk Railway Company, which had obtained legislative permission to take the same; and since then it has operated that road and used its franchises.

A statute of Maine,[1] passed in 1881, enacted that every

---

[1] AN ACT RELATING TO THE TAXATION OF RAILROADS.

*Be it enacted by the Senate and House of Representatives in the Legislature, assembled, as follows :*

SECT. 1. The buildings of every railroad corporation or association whether within or without the located right of way, and its lands and

corporation, person or association, operating a railroad in the State, should pay to the state treasurer, for the use of the

---

fixtures outside of its located right of way, shall be subject to taxation by the several cities and towns in which such buildings, land and fixtures may be situated, as other property is taxed therein.

SECT. 2. Every corporation, person or association, operating any railroad in this State, shall pay to the state treasurer, for the use of the State, an annual excise tax, for the privilege of exercising its franchises in this State, which, with the tax provided for in section one, shall be in lieu of all taxes upon such railroad, its property and stock. There shall be apportioned and paid by the State from the taxes received under the provisions of this act, to the several cities and towns, in which, on the first day of April in each year, is held railroad stock hereby exempted from other taxation, an amount equal to one per centum on the value of such stock on that day, as determined by the governor and council; *provided, however*, that the total amount thus apportioned on account of any railroad shall not exceed the sum received by the State as tax on account of such railroad.

SECT. 3. The amount of such tax shall be ascertained as follows: The amount of the gross transportation receipts as returned to the railroad commissioners for the year ending on the thirtieth day of September next preceding the levying of such tax, shall be divided by the number of miles of railroad operated to ascertain the average gross receipts per mile; when such average receipts per mile shall not exceed twenty-two hundred and fifty dollars, the tax shall be equal to one-quarter of one per centum of the gross transportation receipts; when the average receipts per mile exceed twenty-two hundred and fifty dollars and do not exceed three thousand dollars, the tax shall be equal to one-half of one per centum of the gross receipts; and so on increasing the rate of the tax one-quarter of one per centum for each additional seven hundred and fifty dollars of average gross receipts per mile or fractional part thereof, *provided*, the rate shall in no event exceed three and one-quarter per centum. When a railroad lies partly within and partly without this State, or is operated as a part of a line or system extending beyond this State, the tax shall be equal to the same proportion of the gross receipts in this State, as herein provided, and its amount determined as follows: the gross transportation receipts of such railroad, line or system, as the case may be, over its whole extent, within and without the State, shall be divided by the total number of miles operated to obtain the average gross receipts per mile, and the gross receipts in this State shall be taken to be the average gross receipts per mile, multiplied by the number of miles operated within this State.

SECT. 4. The governor and council, on or before the first day of April in each year, shall determine the amount of such tax, and report the same to the state treasurer, who shall forthwith give notice thereof to the corporation, person or association, upon which the tax is levied.

SECT. 5. Said tax shall be due and payable, one-half thereof on the first

State, "an annual excise tax for the privilege of exercising its franchises" in the State, and it provided that the amount of such tax should be ascertained as follows: "The amount of the gross transportation receipts, as returned to the railroad commissioners for the year ending on the thirtieth of September next preceding the levying of such tax, shall be divided by the number of miles of railroad operated, to ascertain the average gross receipts per mile; when such average receipts per mile shall not exceed twenty-two hundred and fifty dollars, the tax

day of July next after the levy is made, and the other half on the first day of October following. If any party fails to pay the tax, as herein required, the state treasurer may proceed to collect the same, with interest, at the rate of the ten per cent per annum, by an action of debt, in the name of the State. Said tax shall be a lien on the railroad operated, and take precedence of all other liens and incumbrances.

SECT. 6. Any corporation, person or association aggrieved by the action of the governor and council in determining the tax, through error or mistake in calculating the same, may apply for an abatement of any such excessive tax within the year for which such tax is assessed, and if, upon rehearing and reëxamination, the tax appears to be excessive through such error or mistake, the governor and council may thereupon abate such excess, and the amount so abated shall be deducted from any tax due, and unpaid, upon the railroad upon which the excessive tax was assessed; or, if there is no such unpaid tax, the governor shall draw his warrant for the abatement, to be paid from any money in the treasury not otherwise appropriated.

SECT. 7. If the returns now required by law, in relation to railroads, shall be found insufficient to furnish the basis upon which the tax is to be levied, it shall be the duty of the railroad commissioners to require such additional facts in the returns as may be found necessary; and, until such returns shall be required, or, in default of such returns when required, the governor and council shall act upon the best information they may be able to obtain. The railroad commissioners shall have access to the books of railroad companies, to ascertain if the required returns are correctly made; and any railroad corporation, association or person operating any railroad in this State, which shall refuse or neglect to make the returns required by law, or to exhibit to the railroad commissioners their books for the purposes aforesaid, or shall make returns which the president, clerk, treasurer or other person certifying to such returns knows to be false, shall forfeit a sum not less than one thousand dollars, nor more than ten thousand dollars, to be recovered by indictment, or by an action of debt in any county into which the railroad operated may extend.

SECT. 8. All acts and parts of acts inconsistent with this act, are hereby repealed, except as to all taxes heretofore assessed, and this act takes effect when approved. Approved March 17, 1881. Laws Maine, 1881, c. 91.

shall be equal to one-quarter of one per centum of the gross transportation receipts; when the average receipts per mile exceed twenty-two hundred and fifty dollars, and do not exceed three thousand .dollars; the tax shall be equal to one-half of one per centum of the gross receipts; and so on, increasing the rate of the tax one-quarter of one per centum for each additional seven hundred and fifty dollars of average gross receipts per mile or fractional part thereof, *provided*, the rate shall in no event exceed three and one-quarter per centum. When a railroad lies partly within and partly without this State, or is operated as a part of a line or system extending beyond this State, the tax shall be equal to the same proportion of the gross receipts in this State, as herein provided, and its amount determined as follows: the gross transportation receipts of such railroad, line or system, as the case may be, over its whole extent, within and without the State, shall be divided by the total number of miles operated, to obtain the average gross receipts per mile, and the gross receipts in this State shall be taken to be the average gross receipts per mile, multiplied by the number of miles operated within this State."

The act also provided that the governor and council, on or before the 1st of April in each year, should determine the amount of such tax and report the same to the state treasurer, who should forthwith give notice thereof to the corporation, person or association upon which the tax was levied; and that such tax should be due and payable, one-half on the 1st of July next after the levy and the other half on the 1st of October following; and it declared that if any party should fail to pay the tax as required, the state treasurer might proceed to collect the same, with interest at the rate of ten per centum per annum, by an action of debt in the name of the State.

The defendant, The Grand Trunk Railway Company, made no returns as a corporation, but it furnished the data and caused the Atlantic and St. Lawrence Railroad Company to make a return of the gross transportation receipts over its road, 149½ miles in length, including the 82½ miles in Maine, for the years 1881 and 1882, and upon this return the governor and council, pursuant to the statute, ascertained the proportion of the gross

receipts in the State, and assessed the tax in controversy accordingly. The tax thus assessed for 1881 was $9569.66, and for 1882, $12,095.56, and, to recover these amounts as debts to the State, the present action was brought in the Supreme Judicial Court of the State of Maine, and, on application of the defendant, it was transferred to the Circuit Court of the United States. The defendant pleaded *nil debet*, accompanied with a statement of special matters of defence. By stipulation of the parties, the case was tried by the court, which held that the imposition of the taxes in question was a regulation of interstate and foreign commerce, in conflict with the exclusive powers of Congress under the Constitution of the United States, and was therefore invalid. It accordingly gave judgment for the defendant, that the plaintiff take nothing by its writ, and that the defendant recover its costs. From that judgment the case is brought to this court on writ of error.

*Mr. Charles E. Littlefield,* Attorney General of the State of Maine, for plaintiff in error.

The question may be succinctly stated thus: Is a tax upon the gross transportation receipts in the State of Maine of a railroad lying partly within and partly without the State, ascertained by multiplying its average gross receipts per mile for the whole length by the number of miles within this State, in conflict with Art. I, Sec. 8, Part 3, of the Constitution of the United States? Is such a tax a regulation of or an interference with interstate and foreign commerce? We contend that it is not.

We do not deem it profitable to examine all the cases where this question has been before the court in its various phases. We refer only to those upon which we rely as being closely in point, sustaining our contention, and to their present status in this court as authority. The cases of *State Tax on Railway Gross Receipts,* 15 Wall. 284, and the *Delaware Railroad Tax,* 18 Wall. 206, are, we think, decisive in support of our proposition, if they are still binding authority upon this court. A chronological examination of these cases will give a clear idea of the law as it is held to-day.

The case of the *State Tax on Railway Gross Receipts* was one where the State of Pennsylvania assessed a tax upon the Reading Railroad Company, a corporation created by the State of Pennsylvania, under a statute that required railroad companies incorporated under the laws of Pennsylvania to " pay to the Commonwealth a tax of three-fourths of one percentum upon the gross receipts of said company," and as a basis for said tax the company was required to transmit to the auditor general " a statement, under oath or affirmation, of the amount of the gross receipts of the said company during the preceding six months." Here is to be noticed a very important distinction between the Pennsylvania statute and the Maine statute involved at bar. The Pennsylvania statute does not confine the " gross receipts " to those received within the State ; the Maine statute does. The Pennsylvania statute in terms — no exception appearing in the act and in its practical application — applied to all receipts from transportation as well without the State as within it. It covered receipts from freight exported without the State. It could and did operate *extra territorially*. The Maine statute does not and cannot, and certainly the Maine statute is less open to the imputation that it is a regulation of interstate commerce than the Pennsylvania statute. In that case the court held that the Pennsylvania statute was valid, (1) because it was " a tax upon the fruits of such transportation after they had become intermingled with the general property of the carrier; and (2) upon the ground that it was a tax upon the value of the franchise.

We presume that the cases of *Fargo* v. *Michigan*, 121 U. S. 230, and *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, will be relied upon as overruling the case of *State Tax upon Railway Gross Receipts*, but before discussing those cases it is important to call attention to the respect paid by this court to that case as authority up to the time of the decisions in those two cases. See *Osborne* v. *Mobile*, 16 Wall. 479 ; *Erie Railway Co.* v. *Pennsylvania*, 21 Wall. 492 ; *Murray* v. *Charleston*, 96 U. S. 432 ; *Brown* v. *Houston*, 114 U. S. 622 ; *Hall* v. *DeCuir*, 95 U. S. 485 ; *Moran* v. *New Orleans*, 112 U. S. 69.

In a dissenting opinion in the case of *Pacific Railway Co.* v. *Illinois*, 118 U. S. 557, 593, Mr. Justice Bradley, with whom the Chief Justice and Mr. Justice Gray concurred, treats the case of *State Tax on Railway Gross Receipts*, as still authority and binding upon the court, and says upon that point: "We have omitted to cite a number of cases corroborating the views we have expressed. The case of *State Tax on Railway Gross Receipts*, 15 Wall. 284, is weighted with arguments and considerations in this direction. We would also refer to the cases of *Osborne* v. *Mobile*, 16 Wall. 479; *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Railroad Commission Cases*, 116 U. S. 307, 334, 335;" thus clearly assuming that the first case referred to was still binding as authority in the United States Supreme Court, and no intimation is made in the dissenting opinion that the doctrine asserted in that case had been in any way at that time questioned, disputed or denied.

*Fargo* v. *Michigan*, so far from overruling *State Tax on Railway Gross Receipts*, indirectly affirms it. It makes the following distinctions between the two cases: First, the corporation which was the subject of that taxation was a Pennsylvania corporation, having the situs of its business within the State which created it and endowed it with its franchises. Upon these franchises thus conferred by the State it was asserted the State had a right to levy a tax. Second, this tax was levied upon money in the treasury of the corporation, upon money within the limits of the State, which had passed beyond the stage of compensation for freight and had become like any other property or money liable to taxation by the State. The case before us has neither of these qualities. The corporation upon which this tax is levied is not a corporation of the State of Michigan, and has never been organized or acknowledged as a corporation of that State. The money which it received from freight carried within the State probably never was within the State, being paid to the company either at the beginning or the end of its route, and certainly at the time the tax was levied it was neither money nor property of the corporation within the State of Michigan. Neither of these grounds of distinction obtain in the case at bar.

As to *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* 122 U. S. 326, inasmuch as the court. took pains to distinguish the case then under consideration from the second ground relied upon in *State Tax on Railway Gross Receipts,* it is a fair presumption, at least, that the court were not then prepared to declare that ground unsound. We are not aware that the case of *State Tax on Railway Gross Receipts* is questioned or denied in any other decision in this court.

The case of the *Delaware Railroad Tax,* 18 Wall. 206, is, we think, strongly in point in our favor. That was a case where the tax, though not assessed upon the gross railway receipts, was assessed upon net earnings or income received from. all sources during the preceding year, and with the exception of this distinction between the particular sum upon which the tax was assessed, which we submit is in no sense material to the question under discussion, the act of the legislature by virtue of which the tax was assessed was strikingly parallel to that at bar. On the hearing in this court the state officers of Delaware withdrew their appeal, and the. inquiry of the court was thus limited to the validity of the act so far as it imposed the taxes specified in its first and fourth sections. The tax imposed by the first section is the tax that is parallel to the tax at bar. Among other objections it was contended that the act conflicted with the power of Congress to regulate commerce among the several States, and upon this point the court in the opinion say : " The tax imposed by the act in question affects commerce among the States and impedes the transit of persons and property. from one State to another, just in the same way, and in no other, that taxation of any kind necessarily increases the expenses attending upon the use or possession of the thing taxed. That taxation produces this result of itself constitutes no objection to its constitutionality." See also *Baltimore & Ohio Railroad Co.* v. *Maryland,* 21. Wall. 456.

For these reasons we must submit that when the cases of *Fargo* v. *Michigan* and the *Philadelphia Steamship Co.* v. *Pennsylvania* are confined to .the precise facts before the court in each case, neither of them can be held to be in .point

against our contention. While no one can examine the opinions of this court during the last fifteen years upon this question of interstate commerce without becoming impressed with the obvious tendencies to enlarge the doctrine, and limit the power of the State to regulate or affect in any way commerce or its instruments, we think that the fact that in the two most recent cases in the United States that have been announced by the court, that of *McCall* v. *California*, 136 U. S. 104, and *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114, where the court passes adversely, under this clause in the Constitution, upon statutes imposing license taxes, three of the justices dissented in each case, may indicate that the doctrine applicable to these cases has been extended as far as a fair construction of the Constitution will authorize the court to go. It seems to us that the limit has been reached in this case, and that, unless the court are prepared to still further extend it, the cases upon which we rely are unshaken.

Now that Congress, by its recent interstate commerce legislation, is regulating many of these matters, and giving a legislative definition of the proper limits of the Federal and state powers, there would not seem to be any occasion for any extension of these Federal powers by construction on the part of the court.

It is further submitted that the method provided in the statute of determining the value of the franchise upon which this tax should be assessed is one that is eminently fair and just to the corporation, though it may be argued that it is in fact, by its method of application, a mere tax upon the use of the franchise. In the language of the court in *State Tax on Railway Gross Receipts* the tax at bar " imposes no greater burden upon any freight or business from which the receipts come than would an equal tax laid upon a direct valuation of the franchise."

*Mr. A. A. Strout* for defendant in error.

Cases recently decided by this court establish beyond question that the act of the legislature of Maine, and the taxes

imposed thereunder, are invalid, because they are in conflict with the exclusive powers of Congress, under the Constitution of the United States, for the regulation of commerce with foreign nations, and among the several States. Constitution, Art. 1, Sect. 8, Clause 3; *McCall* v. *California*, 136 U. S. 104, and cases cited; *Lyng* v. *State of Michigan*, 135 U. S. 161, 166; *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1; *Sherlock* v. *Alling*, 93 U. S. 99, 102; *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114.

The only business of the defendant in error is interstate and foreign commerce, and upon the privilege of carrying on this business the tax is levied.

It cannot be said that this is a tax upon the receipts, as property in the treasury, of a domestic corporation. The defendant in error is a foreign corporation, and the case finds that its principal place of business is at Montreal. The receipts went to the home office. The statute does not base the tax upon that ground.

The questions involved in the present contention are confined to the following inquiries: (1) Was the business of the defendant in error commerce between the States or with a foreign country? (2) Is this tax placed upon it "for the privilege of exercising its franchises within the State," a burden upon, or otherwise a regulation of such commerce?

The rule to be applied depends upon the facts presented by the record. Repeated and well-considered cases have left no doubt as to what the law is. If the record presents a case where the business in relation to which the tax is levied is interstate or foreign commerce, and the tax placed upon it, by the burden it imposes, or otherwise, operates as a regulation of such commerce, then the law which authorizes such tax is unconstitutional and void, however ingenious the phraseology which it employs in its illegal usurpation of powers conferred by the Constitution exclusively upon Congress.

In *Lyng* v. *Michigan*, 135 U. S. 161, 166, the court said: "We have repeatedly held that no State has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that com-

merce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the 'reason that such taxation is a burden on that commerce, and amounts to a regulation of it which belongs solely to Congress."

In this case there is no question of police regulation and no necessity to invoke the maxim of "*Salus populi suprema lex.*" *Fargo* v. *Michigan*, 121 U. S. 230; *Philadelphia & Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326; *McCall* v. *California*, 136 U. S. 104; *County of Mobile* v. *Kimball*, 102 U. S. 691, 702; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34.

Counsel for the plaintiff in error relies upon the case of *State Tax on Railway Gross Receipts*, 15 Wall. 284, to sustain the validity of the law by virtue of which the taxes under consideration were imposed. It is unnecessary to spend time in replying to his elaborate argument, in which he attempts to show that the case has not been overruled. This record presents no state of facts such as would bring it within the scope and authority of that decision, even if it was unquestioned law; but whether it has been entirely overruled or not, it has been so questioned that it is no longer a conclusive authority, even in a similar case, and to-day would not, in its present form, find its way into the reports of this court.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The tax, for the collection of which this action is brought, is an excise tax upon the defendant corporation for the privilege of exercising its franchises within the State of Maine. It is so declared in the statute which imposes it; and that a tax of this character is within the power of the State to levy there can be no question. The designation does not always indicate merely an inland imposition or duty on the consumption of commodities, but often denotes an impost for a license to pursue certain callings, or to deal in special commodities, or to exercise particular franchises. It is used more frequently, in this country, in the latter sense than in any other. The privi-

lege of exercising the franchises of a corporation within a
State is generally one of value, and often of great value, and
the subject of earnest contention. It is natural, therefore, that
the corporation should be made to bear some proportion of
the burdens of government. As the granting of the privilege
rests entirely in the discretion of the State, whether the cor-
poration be of domestic or foreign origin, it may be conferred
upon such conditions, pecuniary or otherwise, as the State in
its judgment may deem most conducive to its interests or
policy. It may require the payment into its treasury, each
year, of a specific sum, or may apportion the amount exacted
according to the value of the business permitted, as disclosed
by its gains or receipts of the present or past years. The char-
acter of the tax, or its validity, is not determined by the mode
adopted in fixing its amount for any specific period or the
times of its payment. The whole field of inquiry into the
extent of revenue from sources at the command of the corpo-
ration, is open to the consideration of the State in determining
what may be justly exacted for the privilege. The rule of
apportioning the charge to the receipts of the business would
seem to be eminently reasonable, and likely to produce the
most satisfactory results, both to the State and the corpora-
tion taxed.

The court below held that the imposition of the taxes was a
regulation of commerce, interstate and foreign, and therefore
in conflict with the exclusive power of Congress in that respect;
and on that ground alone it ordered judgment for the defend-
ant. This ruling was founded upon the assumption that a ref-
erence by the statute to the transportation receipts and to a
certain percentage of the same in determining the amount of
the excise tax, was in effect the imposition of the tax upon
such receipts, and therefore an interference with interstate and
foreign commerce. But a resort to those receipts was simply
to ascertain the value of the business done by the corporation,
and thus obtain a guide to a reasonable conclusion as to the
amount of the excise tax which should be levied; and we are
unable to perceive in that resort any interference with trans-
portation, domestic or foreign, over the road of the railroad

company, or any regulation of commerce which consists in such transportation. If the amount ascertained were specifically imposed as the tax, no objection to its validity would be pretended. And if the inquiry of the State as to the value of the privilege were limited to receipts of certain past years instead of the year in which the tax is collected, it is conceded that the validity of the tax would not be affected; and if not, we do not see how a reference to the results of any other year could affect its character. There is no levy by the statute on the receipts themselves, either in form or fact; they constitute, as said above, simply the means of ascertaining the value of the privilege conferred.

This conclusion is sustained by the decision in *Home Insurance Co.* v. *New York*, 134 U. S. 594. The Home Insurance Company was a corporation created under the laws of New York, and a portion of its capital stock was invested in bonds of the United States. By an act of the legislature of that State, of 1881, it was declared that every corporation, joint stock company or association, then or thereafter incorporated under any law of the State, or of any other State or country, and doing business in the State, with certain designated exceptions not material to the question involved, should be subject to a tax upon its corporate franchise or business, to be computed as follows: if its dividend or dividends made or declared during the year ending the first day of November, amounted to six per centum or more upon the par value of its capital stock, then the tax was to be at the rate of one-quarter mill upon the capital stock for each one per cent of the dividends. A less rate was provided where there was no dividend or a dividend less than six per cent. The purpose of the act was to fix the amount of the tax each year upon the franchise or business of the corporation by the extent of dividends upon its capital stock, or, where there were no dividends, according to the actual value of the capital stock during the year. The tax payable by the company, estimated according to its dividends, under that law, aggregated seven thousand five hundred dollars. The company resisted its payment, asserting that the tax was, in fact, levied upon the capital stock of the company,

contending that there should be deducted from it a sum bearing the same ratio thereto that the amount invested in bonds of the United States bore to its capital stock, and that the law requiring a tax, without such reduction, was unconstitutional and void. It was held that the tax was not upon the capital stock of the company nor upon any bonds of the United States composing a part of that stock, but upon the corporate franchise or business of the company, and that reference was only made to its capital stock and dividends for the purpose of determining the amount of the tax to be exacted each year. And the court said: "The validity of the tax can in no way be dependent upon the mode which the State may deem fit to adopt in fixing the amount for any year which it will exact for the franchise. No constitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the privileges it bestows."

The case of *Philadelphia and Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, in no way conflicts with this decision. That was the case of a tax, in terms, upon the gross receipts of a steamship company, incorporated under the laws of the State, derived from the transportation of persons and property between different States and to and from foreign countries. Such tax was held, without any dissent, to be a regulation of interstate and foreign commerce, and, therefore, invalid. We do not question the correctness of that decision, nor do the views we hold in this case in any way qualify or impair it.

It follows from what we have said, that the judgment of the court below must be

> *Reversed, and the cause remanded, with directions to enter judgment in favor of the State for the amount of the taxes demanded; and it is so ordered.*

MR. JUSTICE BRADLEY, with whom concurred MR. JUSTICE HARLAN, MR. JUSTICE LAMAR and MR. JUSTICE BROWN, dissenting.

JUSTICES HARLAN, LAMAR, BROWN and myself dissent from the judgment of the court in this case. We do so both on

principle and authority.  On principle, because, whilst the purpose of the law professes to be to lay a tax upon the foreign company for the privilege of exercising its franchise in the State of Maine, the mode of doing this is unconstitutional. The mode adopted is the laying of a tax on the gross receipts of the company, and these receipts, of course, include receipts for interstate and international transportation between other States and Maine, and between Canada and the United States. Now, if after the previous legislation [1] which has been adopted

---

[1] The " previous legislation " referred to in the dissenting opinion is stated in the record as follows :

" The court found the facts as follows : By an act of the Legislature of this State approved Feb'y 10, 1845, the Atlantic and St. Lawrence Railroad Company was incorporated, with power to construct and maintain a railroad from some point in the city of Portland to the boundary line of the State of Maine ' at such place as will best connect with a railroad to be constructed from said boundary to Montreal, in Canada.'

" Section 14 of the act of incorporation further provided ' said corporation is vested with power and authority to continue and prolong said railroad beyond the line of this State to the boundary of Canada, and to purchase, take and hold lands or the right of way over lands for the purpose of constructing said railroad in continuation, without the limits of this State, on and over said lands to the said boundary of Canada :

" ' Provided the same can be done consistently with the laws and regulations of the State or States in which said lands lie and through and over the territory of which such railroad in continuation would pass.'

" The necessary authority for such continuation of the railroad was obtained from the States of New Hampshire and Vermont, and the road was constructed from Portland to Island Pond, in Vermont.  In the State of Maine are 82½ miles of this railroad; in New Hampshire 52 miles, and in Vermont 15 miles.

" By section 16 it was enacted :

" ' All real estate purchased by said corporation for the use of the same, under the fifth section of this act, shall be taxable to said corporation by the several towns, cities and plantations in which said lands lie, in the same manner as lands owned by private persons, and shall in the valuation list be estimated the same as other real estate of the same quality in such town, city or plantation, and not otherwise, and the shares owned by the respective stockholders shall be deemed personal estate and be taxable as such to the owners thereof in the places where they reside and have their home; and whenever the net income of said corporation shall have amounted to ten per centum per annum upon the cost of the road and its appendages and incidental expenses, the directors shall make a special report of the fact to the Legislature, from and after which time one moiety,

with regard to admitting the company to carry on business within the State, the legislature has still the right to tax it for

or such other portion as the Legislature may from time to time determine, of the net income from said railroad accruing thereafter over and above ten per centum per annum, first to be paid to the stockholders, shall annually be paid over by the treasurer of said corporation, as a tax, into the treasury of the State for the use of the State, and the State may have and maintain an action against said corporation therefor to recover the same; but no other tax than herein is provided shall ever be levied or assessed on said corporation or any of their privileges or franchises."

" Section 18 gives to the Legislature the right to inquire into the doings of the corporation and its use and employment of the privileges and franchises granted to it, with power ' to correct and prevent abuses of the same, and to pass any laws imposing fines and penalties upon said corporation which may be necessary more effectually to compel a compliance with the provisions, liabilities and duties hereinbefore set forth and enjoined, but not to impose any other or further duties, liabilities or obligations; and this charter shall not be revoked, annulled, altered, limited or restrained without the consent of the corporation, except by due process of law.'

" The Grand Trunk Railway Company of Canada is a foreign corporation, incorporated under the laws of the Province of Canada, and has its principal place of business at Montreal, in the Dominion of Canada, and possessed in the year 1853, and from that time to the present has continually possessed, a railroad connecting with and in extension of the railroad of the Atlantic and St. Lawrence Railroad Company at Island Pond, in the State of Vermont, and extending to Montreal. It also, at and long before the date of the assessment of taxes demanded in this action, possessed a line of railroad connecting with the before-mentioned railroad at Montreal and extending through the Dominion of Canada to Detroit, in the State of Michigan.

" On the 29th day of March, 1853, by an act of the Legislature of the State of Maine, approved that day, the Atlantic and St. Lawrence Railroad Company was authorized to ' enter into and execute such a lease of the railroad of said company, or contract in the nature of a lease, as will enable the lessee thereof to maintain and operate, by means of said railroad and other roads in extension of the same, a connected line of railroads from the Atlantic Ocean at Portland to the city of Montreal, in the Province of Canada, and thence to the western part of said province.'

" Under the authority thus conferred the Atlantic and St. Lawrence Railroad Company and the Grand Trunk Railway Company entered into a preliminary agreement for a lease to the latter company; but inasmuch as the proposed lessee had not ' the legal competency to enter into and execute such lease for want of the requisite legislative authority therefor,' a lease was on the 5th day of August, A.D. 1853, entered into and executed by the Atlantic and St. Lawrence Railroad Company as lessors and certain individ-

the exercise of its franchises, it should do so in a constitutional manner, and not (as it has done) by a tax on the receipts derived from interstate and international transportation. The power to regulate commerce among the several States (except as to matters merely local) is just as exclusive a power in Con-

---

uals as lessees and trustees for the Grand Trunk Railway Co., the lessees to hold until the Railway Co. should obtain requisite authority, and then to transfer to it the said lease and all right, title and interest under the same.

"The trustees and lessees, on the ninth day of February, A.D. 1855, formally assigned the above-mentioned lease to the defendants, who had, in the meantime, procured the requisite legislative authority, and thereupon the property was delivered to and taken possession of by the defendants, who have ever since possessed, managed, controlled and operated the railroad leased, with all its appurtenances, as a part of their line, from Portland through the States of Maine, New Hampshire and Vermont and the Dominion of Canada to Detroit, in the State of Michigan.

"Feb. 10, 1872, the Lewiston and Auburn Railroad Company was incorporated by the Legislature of Maine, with authority to locate and construct a railroad 'from some point in the city of Lewiston to some point on the Atlantic and St. Lawrence railroad, otherwise known as the Grand Trunk railway, within the limits of the city of Auburn.'

"Under this authority a line some five and one-half miles in length was constructed, and on the 25th of March, A.D. 1874, was leased to the defendants, who have since been constantly in the control, management and possession of the same.

"One clause in this lease is : 'All taxes which may lawfully be assessed upon the corporate property or franchise of the lessors during the period of their lease may be paid by the lessee, and if so paid shall be deducted from the rent herein covenanted to be paid by said lessee.'

"The charter of the Lewiston & Auburn R. R. Co. contains nothing in respect to taxation nor any exemption from or restriction of legislative control.

"The Norway Branch Railroad Company was incorporated by the Legislature of this State Feb. 22, 1872, to construct and maintain a railroad 'from some point in or near the village of Norway, thence to South Paris, connecting at that point with the Grand Trunk railroad.'

"This road is about one and one-half miles in length, and after its construction by permission of the Legislature was leased, prior to the time covered by these assessments, to the defendant company, in whose possession, management and control it has since been.

"Nothing is found in its charter about taxes, nor is the general control of the Legislature in anywise restricted or limited.

"The Atlantic & St. Lawrence Railroad Company was duly constituted a corporation in New Hampshire and Vermont by the legislatures of those States, and its lease to the Grand Trunk Company was by the same authority confirmed and approved."

gress as is the power to regulate commerce with foreign nations and with the Indian tribes. It is given in the same clause and couched in the same phraseology; but if it may be exercised by the States, it might as well be expunged from the Constitution. We think it a power not only granted to be exercised, but that it is of first importance, being one of the principal moving causes of the adoption of the Constitution. The disputes between the different States in reference to interstate facilities of intercourse, and the discriminations adopted to favor each its own maritime cities, produced a state of things almost intolerable to be borne. But, passing this by, the decisions of this court for a number of years past have settled the principle that taxation (which is a mode of regulation) of interstate commerce, or of the revenues derived therefrom, (which is the same thing,) is contrary to the Constitution. Going no further back than *Pickard* v. *Pullman's Southern Car Co.*, 117 U. S. 34, we find that principle laid down. There a privilege tax was imposed upon Pullman's Palace Car Company, by general legislation it is true, but applied to the company, of $50 per annum on every sleeping car going through the State. It was well known, and appeared by the record, that every sleeping car going through the State carried passengers from Ohio and other northern States, to Alabama, and *vice versa*, and we held that Tennessee had no right to tax those cars. It was the same thing as if they had taxed the amount derived from the passengers in the cars. So also in the case of *Leloup* v. *The Port of Mobile*, 127 U. S. 640, we held that the receipts derived by the telegraph company from messages sent from one State to another could not be taxed. So in the case of the *Norfolk and Western Railroad* v. *Pennsylvania*, 136 U. S. 114, where the railroad was a link in a through line by which passengers and freight were carried into other States, the company was held to be engaged in the business of interstate commerce, and could not be taxed for the privilege of keeping an office in the State. And in the case of *Crutcher* v. *Kentucky*, 141 U. S. 47, we held that the taxation of an express company for doing an express business between different States was unconstitutional and void. And

in the case of *Philadelphia &c. Steamship Co.* v. *Pennsylvania,* 122 U. S. 326, we held that a tax upon the gross receipts of the company was void because they were derived from interstate and foreign commerce. A great many other cases might be referred to, showing that in the decisions and opinions of this court this kind of taxation is unconstitutional and void.

We think that the present decision is a departure from the line of these decisions. The tax, it is true, is called a tax on a franchise. It is so called, but what is it in fact? It is a tax on the receipts of the company derived from international transportation.

This court and some of the state courts have gone a great length in sustaining various forms of taxes upon corporations. The train of reasoning upon which it is founded may be questionable. A corporation, according to this class of decisions, may be taxed several times over. It may be taxed for its charter; for its franchises; for the privilege of carrying on its business; it may be taxed on its capital; and it may be taxed on its property. Each of these taxations may be carried to the full amount of the property of the company. I do not know that jealousy of corporate institutions could be carried much further. This court held that the taxation of the capital stock of the Western Union Telegraph Company in Massachusetts, graduated according to the mileage of lines in that State compared with the lines in all the States, was nothing but a taxation upon the property of the company ; yet it was in terms a tax upon its capital stock, and might as well have been a tax upon its gross receipts. By the present decision it is held that taxation may be imposed upon the gross receipts of the company for the exercise of its franchise within the State, if graduated according to the number of miles that the road runs in the State. Then it comes to this: A State may tax a railroad company upon its gross receipts in proportion to the number of miles run within the State, as a tax on its property ; and may also lay a tax upon these same gross receipts, in proportion to the same number of miles, for the privilege of exercising its franchise in the State ! I do not know what else it may

not tax the gross receipts for. If the interstate commerce of the country is not, or will not be, handicapped by this course of decision, I do not understand the ordinary principles which govern human conduct.

We dissent from the opinion of the court.